SANDUSKY FOUNDRY & MACHINE CO. v. DE LAVAUD et al.

(Circuit Court of Appeals, Sixth Circuit. July 23, 1921.)

No. 3521.

1. Patents ⬥⟊36—Facts held sufficient to show that commercial success which is evidence of invention.
   Somewhat vague and general proof of commercial success is sufficient, in the absence of dispute.

2. Patents ⬥⟊30(1)—Device may be operative, though not commercially successful, until slightly changed.
   A device which, in the precise form shown by the Patent Office drawings, requires partial disassembling after each operation, is not thereby made so inoperative as to be unpatentable.

3. Patents ⬥⟊27(2)—Slidability adapted to a new utility may be invention.
   When the addition of a particular slidability of a part brings about a new method of use, it may involve a patentable difference over the older device.

4. Patents ⬥⟊259—Manufacture and sale of device capable of use infringing patent is held infringed.
   Where defendants manufactured a device capable of an infringing use, and sold it with the intent that it shall be so used, they infringe a patent, even though their device is capable of a noninfringing use, and even though they go through the form of instructing that it shall be used in a noninfringing way.

5. Patents ⬥⟊328—1,058,250, claims 1, 2, and 4, for casting iron pipes, held infringed.
   The Millspaugh patent, No. 1,058,250, claims 1, 2, and 4, for the casting of iron pipes in a whirling mould, held infringed by Kneass patent, No. 538,835.

**6. Patents ⊚⇒328—1,047,972, claim 1, for casting iron pipes, held invalid.**
    The Millspaugh patent, No. 1,047,972, claim 1, for casting iron pipes, *held* invalid, as not being an invention.

**7. Patents ⊚⇒322—Accounting not ordered in all cases.**
    An accounting will not be ordered, if a preliminary inquiry shows no probability of substantial damages or profits.

Appeal from the District Court of the United States, for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit by the Sandusky Foundry & Machine Company against D. Sensaud de Lavaud and others. From a judgment for defendants, plaintiff appeals. Reversed in part; affirmed in part.

See, also, 251 Fed. 631; 258 Fed. 640.

Livingston Gifford and E. W. Marshall, both of New York City (Squire, Sanders & Dempsey, of Cleveland, Ohio, on the brief), for appellant.

Frank J. Kent, of New York City (Albert Lynn Lawrence, of Cleveland, Ohio, on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. The appellant (hereinafter called plaintiff) brought in the court below the usual infringement suit, based upon patents No. 1,058,250, issued April 8, 1913, on an application filed in 1911, and No. 1,047,972, issued December 24, 1912, on an application filed in 1912; both granted to Millspaugh and both pertaining to centrifugal casting. As to No. 1,058,250, which we shall call the first patent, infringement is alleged of claims 1, 2, and 4. Under the second patent, claim 1 is the only claim involved. The District Judge thought the first patent not infringed, and the second patent invalid.

Claim 1 of the first patent is sufficiently typical. It reads:

A hollow rotary member having an internal surface of definite shape surrounding the axis of rotation, a driving mechanism therefor, a filling trough, arranged to hold a predetermined amount of material, rotatably and slidably supported, projecting into said member, and means for moving said trough.

The common method of casting pipe was to provide a vertical mould for the outside and a core for the inside, and to pour the molten metal into the intermediate space. This process involved danger of imperfections, such as greater density at the bottom, imprisoned air bubbles, etc. It has long been known, at least in theory, that, if the molten metal were introduced into the center of a rapidly revolving hollow cylinder, centrifugal force would distribute the material around the interior wall of the cylinder, which would serve as a mould, and the centrifugal impetus would supply the place of the core. This would give, in theory, a tube or pipe of great perfection, with walls of the same thickness or density in all parts, and with a very regular exterior surface, since impurities are commonly lighter than the metal to be cast, and would hence remain upon the inside of the tube. The record indicates that a product thus produced was commercially unknown, and that very likely the difficulty of introducing the molten material into the inside

of the revolving cylinder at all parts of its length at the same time was the reason why the idea had not been commercially practiced.

Millspaugh's first invention was directed to the meeting of this difficulty. After mounting his cylindrical shell or mould horizontally, so that it could be rotated by means in contact with the outside, he provided a trough located in the axis of the shell and capable of being held at each end in axial position. It was also adapted to slide longitudinally part way out of the shell and to be rotated at least half a turn independently of the shell. In operation, the shell was put in revolution and the trough withdrawn longitudinally so that it projected slightly from the shell at one end, the trough-opening being on the upper side, and both ends of the trough being closed. Thereupon the molten metal was poured into the trough at the projecting end, and distributed itself evenly along the trough, which was then caused to slide back into the shell until it was entirely inside and axially held in position. It was then turned upside down. This distributed the material in an even body over the interior of the shell and for the length of the trough.

[1] We cannot doubt that this device was commercially successful and became practically the foundation of a new art. Upon this subject plaintiff contented itself with rather vague and general testimony to the effect that large amounts had been expended in development; that the plaintiff was a manufacturer of paper mill machinery; that tubes made according to this centrifugal process are used in such machinery and have been very largely adopted; that the plaintiff's ability to make this perfect pipe is chiefly what has developed plaintiff's business, and that several licenses have been granted. There was no cross-examination on this subject, nor was there testimony to dispute what was claimed in this regard. We think plaintiff was justified in assuming that there was sufficient proof of the commercial utility of the device to serve the customary purposes of such evidence.

[2] Neither can we think that there was anything inoperative about the machine as disclosed in the patent. The only serious criticism made along this line is that, if the machine were built and mounted precisely as shown in the Patent Office drawing, the tube, after casting, could not be removed from the mould without disturbing the assembly. That is true, because the standards which support the trough axis would be in the way of withdrawing the tube horizontally from the mould, excepting to the same distance which it is contemplated the trough may be withdrawn. It is a familiar rule that the Patent Office drawings are more or less conventional and are not to be considered as working drawings, and hence no defect is fatal which could be remedied by any mechanic by obvious means. The standards in this drawing are shown held to the floor by bolts and nuts. It would apparently take only a moment to remove these nuts and take the standard and the trough shaft out of the way, and the placing and replacing of this standard would not be a serious matter in such a machine as this. It would also be plain that one or the other part could be mounted on a carriage so as to permit separation if desired. With this view of the unsubstantial character of the defect, it is not important whether plaintiff's successful opera-

tion was with a machine of the precise form shown in the drawing or was with a machine embodying obvious modifications.

[3] It is necessary to refer to only one of the patents relied upon in defense, as that is the closest approximation to Millspaugh shown in the record. It is the patent to Kneass, No. 538,835, of May 7, 1895. It is sufficient to say that one figure of this patent, given as a suggestion of an alternate form, though awkward and probably impractical in some details, discloses Millspaugh's claimed construction with one exception.[1] Kneass has a trough which extends the full length of the shell and also projects endwise beyond. The metal is poured into the projecting open end, and it is Kneass' theory that it will flow along into the inside portion of the trough and be dumped wholly inside instead of partially outside. His device might or might not accomplish this result; but he did not contemplate or show a trough which was slidable in the Millspaugh sense. His drawings indicate that the trough supporting standard is on a carriage intended for longitudinal travel, and this or its equivalent would be a necessary means for getting the trough out of the way when the casting was to be withdrawn; but there could have been no intention to withdraw the trough partially, or for filling, for he has so carefully provided for ability to fill without withdrawal. By Millspaugh's slidability—sliding out and sliding in—he insures that the trough can be filled from the outside, but that, before dumping, the metal-carrying portion shall be entirely inside. This has clear advantages, and we think it a patentable difference as compared with Kneass. It follows that, while the Millspaugh first patent is valid, it must be confined to such a slidable support for the trough as contemplates its partial withdrawal for filling and then its sliding return to effective dumping position wholly within the shell, and from this point of view, we must treat the question of infringement.

[4, 5] Defendants' device responds without question to the claims in suit in every particular, unless with regard to this characteristic sliding function. Defendants have a rotatable and slidable support for the trough, but this sliding is perhaps necessary, as it was with Kneass, to get the trough supports out of the way for withdrawing the casting. They mount a hopper upon their trough axis or continuation of the trough outside the shell, and provide a longitudinal conduit within the axis which will conduct the flowing metal from the hopper into the trough within the shell. There is thus in theory no occasion to slide the trough out for the purpose of filling just before dumping; and we conclude that the method of operation for which the defendants' device is thus apparently intended would not be an infringing use. But that is not the end of the question. Where defendants manufacture a device capable of an infringing use and sell it with the intent that it shall be so used, they infringe the patent, even though their device is capable of a

---

[1] The limiting clause, "arranged to hold a predetermined amount of material," does not effectively distinguish from Kneass, and while the quick dumping of the patent in suit, as contrasted with the slow tilting of Kneass, might distinguish, this feature of quick dumping is not found in the claims in suit.

noninfringing use, and even though they go through the form of instructing that it shall be used in a noninfringing way.

Weed Co. v. Cleveland Co. (D. C.) 196 Fed. 213; Parsons Co. v. Asch (D. C.) 196 Fed. 215.

It seems natural that, if defendants' device is operated strictly according to their theory, some melted metal will remain in the hopper, and that when it is upset this metal will be spilled outside, and that the portion in the conduit may run back into the hopper, instead of inwardly into the trough, or that with slight use the conduit will become obstructed by the metal which cools and adheres, or that the hopper will become partially clogged in the same way. If those things occur, the device then could be used, and probably would be used, in the characteristic Millspaugh manner. It seems, therefore, that at least occasional use of this character must have been contemplated by the maker. This inference is confirmed by the fact that the axial spindle on the inner end of the trough is prolonged in a manner which was seemingly intended to facilitate this partial withdrawal while maintaining perfect axial position. The proof as to actual use also confirms this inference. There is no evidence as to the use of defendants' machine, excepting as to a more or less experimental use at the factory where it was manufactured for them. The witness who did this manufacturing and who was apparently disinterested is somewhat confused, but seems to intend to say that in the operation which he witnessed these suggested troubles did occur and that most of the work was done by sliding out the trough in the Millspaugh manner and filling it on the outside. We find also that an advertising "write-up" of defendants' machine—seemingly their authorized statement—distinctly describes withdrawal for filling as being the intended method of operation.

When we consider the advertisement and this testimony as to what was actually done, and observe the probability of a common necessity for resorting to Millspaugh's function, and that the defendants' form responds literally to the claim, we do not think that the charge of infringement can be escaped just because the device is capable of use in a manner which the patent can not rightly reach. It may be that the situation presents complications which make an assessment of damages impracticable; but this record does not raise that question; an injunction, at least, is appropriate.

The case would be more difficult of decision were it not that the defendants can apparently, if they wish, so modify their device that it can not be used according to Millspaugh's theory. Doubtless there are expedients among which a satisfactory selection could be made, if the capacity of withdrawal for filling is, in truth, not important.

[6] As to the second patent, we agree with the court below that it does not involve any invention, so far as concerns the claim in suit. This is distinguished from the first patent only by providing that the trough-opening shall be shorter than the shell, when the trough is fully inserted. The stated object is to prevent the metal being spilled against the ends of the shell. If there was trouble from this cause, it seems clear to us that to shorten the trough-opening, either by making the

trough shorter or by covering over the portion near the end, was a mere expedient not involving any invention.

[7] The decree as to the first patent must be reversed, and the case remanded, for the usual interlocutory decree for an injunction on the claims in suit. The court below will determine, upon such preliminary inquiry as seems fitting, whether the recovery of any substantial damages or profits is so improbable as to justify declining to make the usual order for an accounting. Merriam v. Saalfield (C. C. A. 6) 198 Fed. 369, 371, 372, 117 C. C. A. 245, and cases cited. As to the second patent, the decree is affirmed. The appellant will recover costs of this court.